UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TYRONE JEROME PETERSON,

      Plaintiff,

v.                                          Case No. 6:10-cv-521-Orl-DAB

HANK WONG, et al.,

      Defendants.

_____

## ORDER

This case is before the Court on Defendants Hank Wong ("Wong"), Timothy Kuzma ("Kuzma"), Richard Ruth ("Ruth"), and Anthony Kirby's ("Kirby") (collectively "Defendants") Motion for Summary Judgment (Doc. No. 79) and Plaintiff's Response in Opposition to the Motion for Summary Judgment (Doc. No. 82).[1] As discussed hereinafter, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.   *Factual Background*[2]

Plaintiff, a prisoner proceeding *pro se*, filed the instant civil rights action. Plaintiff alleges that Defendants, officers of the Orlando Police Department ("OPD"), used excessive force against him during his arrest in violation of the Fourth and Fourteenth Amendments. (Doc. No. 45 at 6-11.)

The facts surrounding the incidents forming the basis of Plaintiff's claims are as

---

[1] Plaintiff's Response in Opposition to the Motion for Summary Judgment was filed as an Amended Motion for Summary Judgment. *See* Doc. No. 82. However, Plaintiff subsequently notified the Court that he intended his Amended Motion for Summary Judgment to serve as his Response to Defendants' Motion for Summary Judgment. *See* Doc. No. 86. The Court, therefore, construes the Amended Motion for Summary Judgment to be a Response in Opposition to Defendants' Motion for Summary Judgment and will direct the motion to be terminated.

[2] In considering the motion for summary judgment, the statement of facts is derived from the Amended Complaint (Doc. No. 45), affidavits, and other evidence submitted by Plaintiff and Defendants in support of, or in opposition to, the dispositive motion.

follows.  On May 4, 2008, at approximately 4:00 a.m., Defendants responded to a call from

dispatch regarding an intrusion alarm that had been activated at Orlando Auto Specialists

("business"), located on John Young Parkway.  (Doc. No. 79-1 at 1; Doc. No. 79-2 at 2; Doc.

No. 79-3 at 1; Doc. No. 79-4 at 1.)  Prior to arriving at the business, Defendants Kuzma and

Ruth learned from another officer that an individual, subsequently identified as Plaintiff,

was attempting to remove the rims from a vehicle.  (Doc. No. 79-1 at 1; Doc. No. 79-2 at 2.)

Officer Lincoln, who was on the scene, informed Defendant Kuzma that Plaintiff was

fleeing the scene and was refusing to obey his commands to stop.  (Doc. No. 79-1 at 1-2.)

Plaintiff saw an officer chasing him as he was running from the scene.  (Doc. No. 79-5 at

18.)  When Defendant Kuzma arrived, he observed Plaintiff scale a fence located in front

of the business and run through a parking lot.  (Doc. No. 79-1 at 1; Doc. No. 82-1 at 1.)

Plaintiff got into his vehicle and began to drive out of the parking lot in order to get

away from the police.  (Doc. No. 79-5 at 18-19.)  Defendant Kuzma approached the parking

lot to the west of Hansrob Road at which time he attests Plaintiff accelerated his vehicle in

his direction.  (Doc. No. 79-1 at 2.)  Plaintiff, who was looking straight ahead and "never

turned [his] head", did not see any officers around his vehicle but cannot definitively say

there were not any officers around his vehicle.  (Doc. No. 79-5 at 20-21.)  Defendant Kuzma

attests that he fired his gun three times at Plaintiff's vehicle because he was in fear for his

safety and the safety of the other officers in the area based on Plaintiff's driving.  (Doc. No.

79-1 at 2.)  In contrast to Defendant Kuzma and Ruth's attestations, Plaintiff attests that

although he did not see any officers, he attempted to surrender at which time someone shot

at his vehicle from behind.[3]   (Doc. No. 82-1 at 2.)  Plaintiff heard gunshots less than ten

seconds after he began to drive.  (Doc. No. 79-5 at 21.)

   After Plaintiff heard gunshots, his rear passenger window was broken out.  (Doc.

No. 79-5 at 18, 21.)  Plaintiff, fearing for his life, continued to drive southbound on Hansrob

Road.  (Doc. No. 79-5 at 22; Doc. No. 82-1 at 2.)  Defendant Ruth and Officer Russell ran

north on Hansrob Road toward the parking lot based on the information they had received

concerning Plaintiff's direction of travel.  (Doc. No. 79-2 at 1.)  Defendant Ruth heard the

gunshots that had been fired and believed that Plaintiff had shot at Officer Lincoln, who

Defendant Ruth knew had been chasing Plaintiff.  (Doc. No. 79-2 at 2.)

   Defendant Ruth attests that Plaintiff drove his vehicle toward him and Officer

Russell at a high rate of speed, causing him to be in fear for their safety.  *Id*. at 2.  Defendant

Ruth further attests that he shot his weapon at Plaintiff's vehicle based on his fear for their

safety and to prevent Plaintiff from escaping the area as he feared for the safety of others.[4]

*Id*.  Plaintiff denies that he drove his vehicle in Defendant Ruth and Officer Russell's

direction.  (Doc. No. 79-5 at 4.)

   Plaintiff proceeded onto Silver Star Road, traveling west.  (Doc. No. 82-1 at 2.)  At

that time, Defendants Wong and Kirby, who had also responded to the dispatch, began to

follow Plaintiff with their lights and sirens activated.  (Doc. No. 79-3 at 2; Doc. No. 79-4 at

---

[3]In his deposition, Plaintiff testified that after he got in his vehicle, he "immediately took off.  Waiting, that would actually defeat the purpose.  I'm trying to get away.  Why would I wait in the car?. . . So actually, after I got in the car, I threw it in drive and took off."  (Doc. No. 79-5 at 19.)

[4]Defendant Ruth did not indicate in his affidavit the number of shots he fired at Plaintiff's vehicle.  Along with his affidavit, Plaintiff filed part of the charging affidavit, which states that Defendant Ruth fired eight shots. (Doc. No. 82-1 at 16.)  Apparently, however, many, if not all, of the shots did not hit Plaintiff's vehicle in light of Plaintiff's testimony that he does not recall eight shots being fired into the vehicle and "if they were fired, they were fired into the air. . . ."  (Doc. No. 79-5 at 22-23.)

2.)  Defendants Wong and Kirby believed that Plaintiff had committed the offenses of burglary and aggravated assault with a deadly weapon on the other officers by driving his vehicle at them.  *Id*.  They also thought that Plaintiff had fired shots at other officers.  *Id*.

Plaintiff did not stop his vehicle because he maintains he feared for his life.  *Id*.; *see also* Doc. No. 82-1 at 2.  Instead, Plaintiff drove through two residential neighborhoods while Defendants Wong and Kirby continued to chase him.  (Doc. No. 79-3 at 2; Doc. No. 79-4 at 2; Doc. No. 82-1 at 2.)  Defendants Wong and Kirby attest that Plaintiff drove recklessly, disobeying traffic laws and endangering the safety of other drivers.  (Doc. No. 79-3 at 2.)  In contrast, Plaintiff attests that he was driving no more than thirty miles per hour.  (Doc. No. 82-1 at 2.)  However, in his deposition, Plaintiff testified that he did not know how fast he was driving but he had his "foot on the floor".  (Doc. No. 79-5 at 25.) Plaintiff further stated that he did not know if he ran any red lights, but he admitted he did not stop while being pursued until he subsequently was stopped by Defendant Wong.  *Id*. Defendant Wong attests that as Plaintiff drove through the second neighborhood, he lost control of his vehicle and veered into a vacant lot between two houses, whereas Plaintiff attests that he stopped his vehicle.  (Doc. No. 79-3 at 2; Doc. No. 82-1 at 3.)  At that time, Defendant Wong bumped Plaintiff's vehicle and pushed it against a fence to prohibit him from moving.  (Doc. No. 79-3 at 2.)

Defendant Wong commanded Plaintiff to exit the vehicle with his hands displayed. *Id*.  Plaintiff did not acknowledge Defendant Wong's command but instead jumped out of his vehicle and ran towards the fence despite hearing someone say stop.  *Id*.; Doc. No. 82-1 at 3; Doc. No. 79-5 at 28.  Defendant Wong observed Plaintiff making furtive movements with his hands near his waistband prior to exiting his vehicle.  (Doc. No. 79-3 at 2.)  As

such, Defendant Wong was afraid Plaintiff had a firearm he was attempting to prepare for discharge. *Id.* Defendant Kirby arrived as Plaintiff was exiting his vehicle and commanded Plaintiff to stop and show his hands several times. (Doc. No. 79-4 at 2.)  Defendant Kirby observed an object in Plaintiff's hand as he ran to the fence.  *Id.*

Upon reaching the fence, Plaintiff began to scale it at which time Defendants Wong and Kirby discharged their firearms at Plaintiff.[5]  (Doc. No. 79-3 at 3; Doc. No. 79-4 at 2.) Defendants Wong and Kirby feared that Plaintiff represented a danger to the residents in the neighborhood based on Plaintiff's actions that night in fleeing from the police to avoid apprehension.  (Doc.  No. 79-3 at 3; Doc. No. 79-4 at 2-3.)

According to Plaintiff, he was shot once in the buttocks and once in the hip as he was crossing the fence. (Doc. No. 79-5 at 28.) Plaintiff attests that after he was down on the ground on the other side of the fence, Defendants continued to fire shots while he was telling them to stop because they had him.  (Doc. No. 82-1 at 3.)  Plaintiff admitted, however, that after he was shot, all he heard was more fire until he heard an officer asking from the other side of the fence where he was.  (Doc. No. 79-5 at 29.)  Plaintiff states that he was shot three additional times, in his left foot, right knee, and left calf.  *Id.* at 3-4.  The medical reports submitted by Plaintiff reflect that he had four bullet wounds, two to his buttocks, one to his right thigh, and one to his left ankle/foot.  (Doc. No. 82-1 at 18-19.)

One of the Defendants subsequently climbed over the fence and pushed Plaintiff over it to the other side. (Doc. No. 79-5 at 29-30.) Defendant Kuzma, who had arrived after the vehicle chase terminated, handcuffed Plaintiff, and Plaintiff remained lying on the

---

[5]Defendants Kirby and Wong did not indicate in their affidavits the number of shots they fired. However, the charging affidavit filed by Plaintiff indicates that Defendant Wong fired sixteen shots and Defendant Kirby fired two shots.  (Doc. No. 82-1 at 16.)

ground.  (Doc. No. 79-1 at 2; Doc. No. 82-1 at 4.)  According to Plaintiff, after he was handcuffed, Defendants stood over him and "made up stories of what they were going to say".[6]  (Doc. No. 79-5 at 33-34.)  Subsequently, Plaintiff heard the officers yell to look out for the dog, and a dog bit Plaintiff's left calf.  (Doc. No. 45; Doc. No. 79-5 at 33-35; Doc. No. 82-1 at 4.)  Plaintiff received medical treatment for a dog bite, as well as his gunshot wounds, on the date of the incident. (Doc. No. 82-1 at 18-22.)

Defendants attest that an OPD K-9 was not deployed after the vehicular pursuit concluded, no force was used against Plaintiff after he was handcuffed, and Plaintiff was not bitten by an OPD K-9.  (Doc. Nos. 79-1 at 2; 79-2 at 2;  79-3 at 3; 79-4 at 3.)  After Plaintiff's apprehension, Defendant Wong observed a loaded .45 caliber firearm on the driver's side of Plaintiff's vehicle.  (Doc. No. 79-3 at 3.)

Plaintiff was charged *inter alia* with burglary and aggravated assault with a deadly weapon.[7]  (Doc. No. 79-5 at 12-13.)  Plaintiff entered a plea of no contest and was convicted of burglary and one count of aggravated assault with a deadly weapon in relation to the incident.  *Id*. at 13, 39.

## II.    *Standard for Summary Judgment*

"Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[6]Plaintiff testified at his deposition that "[t]hey put the aggravated assault on me. I didn't assault anyone. I didn't - - I never went towards anybody, never put anybody's life in jeopardy.  I never threatened nobody in no kind of way."  (Doc. No. 79-5 at 34.)  As noted *infra*, however, Plaintiff entered a plea of no contest to aggravated assault with a deadly weapon.  (Doc. No. 79-5 at 12-13, 39.)

[7]From the evidence presented, it is not clear how many charges were filed against Plaintiff.  The charging affidavit filed by Plaintiff, however, indicates that probable cause existed to charge Plaintiff with burglary, three counts of aggravated assault on a law enforcement officer (for actions taken against Kuzma, Ruth, and Russell), resisting arrest with violence, resisting arrest without violence, fleeing and eluding, and possession of a firearm by a convicted felon.  (Doc. No. 82-1 at 16.)

material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010) (citing Fed. R. Civ. P. 56).   At this stage of the proceedings, "the evidence and all reasonable inferences from that evidence are viewed in the light most favorable to the nonmovant, but those inferences are drawn "only 'to the extent supportable by the record.'"  *Id.* (quoting *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010).  The burden of establishing that there is no genuine issue of material fact lies on the moving party, and it is a stringent one.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Rule 56(c)(1) provides as follows:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  If, after

the movant makes its showing, the nonmoving party brings forth evidence in support of its position on an issue for which it bears the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.    *Analysis*

Plaintiff maintains that Defendants violated his Fourth and Fourteenth Amendment rights when they used excessive force against him.  Specifically, Plaintiff contends that Defendants shot him multiple times and allowed a K-9 to bite him after he was handcuffed and non-resistant.

In an excessive force case arising out of an arrest, the claim is analyzed pursuant to the Fourth Amendment.  *Graham v. O'Connor*, 490 U.S. 386, 394-95 (1989); *Reese v. Herbert*, 527 F.3d 1253, 1262 n. 11 (11th Cir. 2008) (noting that although the Fourth Amendment is applicable to state and local governments under the Due Process Clause of the Fourteenth Amendment, all claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop are analyzed under the Fourth Amendment's "reasonableness standard" only and not using a substantive due process approach) (citations omitted).

Defendants contend that they are entitled to qualified immunity.  In support of their motion, Defendants argue that their use of force was objectively reasonable such that there was no violation of the Fourth Amendment.  Defendants further assert that their actions did not violate clearly established law.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (quotation omitted).   To be entitled to qualified immunity, a government official first must demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Rich v. Dollar,* 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir. 1983)).   If the defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers; and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional.  *See Saucier v. Katz,* 533 U.S. 194, 201 (2001); *see also McCullough v. Antolini,*  559 F.3d 1201, 1205 (11th Cir. 2009).  Courts are permitted to exercise discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *See Pearson*, 555 U.S. at 236.

In the instant case, based on the allegations in the amended complaint and the evidence presented, the Court concludes that Defendants were acting in the scope of their discretionary authority when the incident occurred.  Accordingly, the Court will consider whether Plaintiff has alleged a constitutional violation against Defendants.

In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's "objective reasonableness" standard.  *Brosseau v. Haugen,* 543 U.S. 194, 197 (2004) (citing *Tennessee v. Garner,* 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989)).  "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use

9

some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "However, the level of force applied must not exceed that which a reasonable officer would believe . . . is necessary in the situation at hand." *Penley*, 605 F.3d at 849 (quotation omitted). In determining the reasonableness of the force applied, courts "'look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate.'" *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012) (quoting *McCullough*, 559 F.3d at 1206). An officer's conduct "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Police officers can be forced to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205. "'The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded.'" *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009))

Whether an officer's use of force was objectively reasonable is dependent on all the circumstances relevant to the officer's decision to use deadly force, such as: (1) the seriousness of the offense, (2) whether the suspect posed an immediate danger to the officer or others, (3) whether the suspect resisted or attempted to evade arrest, and (4) the feasibility of providing a warning before employing deadly force. *Jean-Baptiste*, 627 F. 3d at 821 (quotation omitted); *Penley*, 605 F.3d at 850. Other factors to consider are the need

for application of force, the relationship between the need and amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously or sadistically. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).

The Eleventh Circuit has held that an officer is "entitled to qualified immunity if he 'reasonably could have believed that probable cause existed, in light of the information [he] possessed[,]' to shoot [the suspect], even if that belief was mistaken." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1167. Furthermore, an officer's "use of force is judged objectively, and he is shielded from liability 'unless application of [that] standard would inevitably lead every reasonable officer in [his] position to conclude the force was unlawful.'" *Id*. (citing *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

The Court will address Plaintiff's excessive force claims arising from the shootings and dog bite separately. The excessive force claims arising from Defendants' discharge of their firearms will be considered as to each Defendant individually. The Court will address the excessive force claim arising from the dog bite collectively.

### A.    *Discharge of Firearms*

### I.    *Officer Kuzma*

The evidence presented establishes that Defendant Kuzma responded to an intrusion alarm call at a business in the early morning hours of May 4, 2008. Prior to encountering Plaintiff, Defendant Kuzma also knew from another officer that Plaintiff had been observed attempting to remove a rim from a vehicle at the premises. Moreover, Defendant Kuzma knew that Officer Lincoln was pursuing Plaintiff, and Plaintiff refused to obey his commands to stop.

"Probable cause to arrest exists when law enforcement officials have facts and

11

circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Williams v. Sirmons*, 307 F. App'x 354, 358 (11th Cir. 2009) (citing *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002) and *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir.1998) (explaining that "the standard for determining the existence of probable cause is the same under both Florida and federal law")). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Scott v. Clay County, Tenn*, 205 F.3d 867, 877 (6th Cir. 2000) (quoting *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir.1999)). Additionally, "both the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer." *Terrell*, 668 F.3d at 1252 (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985), and *Voorhees v. State*, 699 So.2d 602, 609 (Fla. 1997) (per curiam) for the proposition that "[t]he fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers.")).

Given the facts known to Defendant Kuzma on the night of the incident, the Court determines that he had probable cause to believe that Plaintiff had committed a burglary and was resisting an officer without violence. *See* Fla. Stat. § 810.02 (2008) (defining burglary); Fla. Stat. § 843.02 (2008) (defining misdemeanor resisting an officer without violence). In fact, Plaintiff subsequently entered a plea of no contest to burglary.

Furthermore, Defendant Kuzma attests that Plaintiff accelerated his vehicle in his direction, placing him in fear for his safety and the safety of the other officers in the area. Plaintiff, however, attests that he did not see any officers other than the one from whom he ran, and he testified at his deposition that he never committed aggravated assault. (Doc.

12

No. 79-5 at 34; Doc. No. 82-1 at 2.) Nevertheless, Plaintiff testified at his deposition that he could not definitively say there were not any officers around his vehicle and he was only looking straight ahead and never turned his head. (Doc. No. 79-5 at 20-21.) Additionally, Plaintiff submitted, along with his affidavit, a drawing of the scene, which he maintains reflects "the location of the scene at which [he] first encountered the police officers. . . ." (Doc. No. 82-1 at 4.) Plaintiff further states that the drawing is a "true and accurate depiction[] of the scene. . . ."[8] *Id.*

Review of Plaintiff's drawing indicates that Defendant Kuzma was located in the exit of the parking lot through which Plaintiff drove his vehicle. *See* Doc. No. 82-1 at 8. From these statements and Plaintiff's drawing, the Court concludes that Plaintiff has not created a genuine issue of material fact that an objectively reasonable officer on the scene would not have perceived that Plaintiff accelerated his vehicle in Defendant Kuzma's direction. Therefore, Defendant Kuzma reasonably could have concluded that probable cause existed to believe that Plaintiff had committed the offense of aggravated assault with a deadly weapon. *See* Fla. Stat. § 784.021(1)(A)(2008). As noted previously, the Eleventh Circuit has held that an officer is "entitled to qualified immunity if he 'reasonably could have believed that probable cause existed, in light of the information [he] possessed[,]' to shoot [the suspect], even if that belief was mistaken." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1167).

Moreover, although Plaintiff testified in his deposition that he never committed aggravated assault and Defendants fabricated the story, he admitted that he entered a plea

---

[8]Of interest, Plaintiff maintains in his affidavit and deposition testimony that when leaving the scene of the burglary, he did not observe any officers other than Officer Lincoln, from whom he ran. Nevertheless, Plaintiff indicates in his affidavit that the drawing reflects where he encountered the individual officers.

of no contest to aggravated assault with a deadly weapon. *See Brown v. City of Hialeah*, 30 F.3d 1433, 1437 (11th Cir. 1994) (holding in a § 1983 action that Florida law regarding defensive collateral estoppel precluded the defendant, who had entered a guilty plea to a charge of attempted murder of an officer, from offering evidence in the civil case to establish that he did not attempt to shoot the officer); *see also Carter v. Gladish*, No. 8:03-cv-1194-T-17TBM, 2005 WL 1712263, at * 9 (M.D. Fla. July 21, 2005) (noting under Florida law a plea of nolo contendere has the same legal effect in a criminal proceeding as a guilty plea); *Harris v. Kado*, 391 F. App'x 560, 564 (7th Cir. 2010) (applying doctrine of issue preclusion *sua sponte* in § 1983 action); *cf. Hadley v. Gutierrez*, 526 F. 3d 1324, 1332 (11th Cir. 2008) (noting that while defensive collateral estoppel can be used "in the criminal-to-civil context[,] . . . . collateral estoppel does not apply where one of the issues forming the basis of the civil lawsuit was not necessarily resolved in the prior criminal proceeding.") (citations omitted)).

Likewise, prior to firing three shots at Plaintiff's vehicle, Defendant Kuzma knew that Plaintiff had attempted to evade arrest by running from Officer Lincoln and had refused to stop despite commands to do so. Of course, Defendant Kuzma also knew that Plaintiff was attempting to evade arrest by fleeing in his vehicle. Additionally, Plaintiff was in his vehicle and had been driving for less than ten seconds before the first shots were fired (Doc. No. 79-5 at 21), which supports a determination that it was likely not feasible for Defendant Kuzma to provide a warning before he fired shots at the vehicle. Moreover, Defendant Kuzma only fired three shots at Plaintiff's vehicle, and Plaintiff suffered no injuries from his shots.

In *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005), the Eleventh Circuit held

that an officer who shot and killed a suspect during an arrest did not use excessive force

in violation of the Fourth Amendment and was entitled to summary judgment.  The facts

surrounding the shooting were summarized as follows:

> Members of the Atlanta High Intensity Drug Trafficking
> Area ("HIDTA") Task Force arrested two individuals on June
> 6, 2001. . . for selling nine ounces of heroin to an undercover
> agent.  One of the suspects agreed to cooperate by assisting the
> agents in apprehending his suppliers.  He arranged to meet his
> suppliers later that day, under the pretense of delivering the
> funds he received from the sale of heroin.
>
> That afternoon, the HIDTA agents gathered by a
> doughnut shop on Ponce where the delivery was to take place.
> The cooperating suspect identified a Ford Escort carrying three
> passengers as the vehicle in which his suppliers were driving.
> Arrugueta, a special agent employed by the Immigration and
> Naturalization Service, followed the Escort in an unmarked
> vehicle.  The Escort. . . stopped three to four feet behind a
> civilian car waiting at a traffic light on the corner of Ponce and
> Argonne Avenue.  The driver of the vehicle and a passenger
> then exited the Escort and began walking toward the doughnut
> shop.  All units converged upon them.  Both suspects were
> arrested promptly thereafter.
>
> Walters, the remaining suspect who apparently had also
> exited the Escort and then re-entered, was sitting somewhere
> in between the front right passenger seat and the driver's seat.
> Arrugueta had exited his car and stood in between the Escort
> and the car in front of it.  The distance between Arrugueta and
> the Escort was only two to four feet at the most.  Arrugueta
> pointed his gun at Walters, verbally identified himself as
> "Police," and told him to put his hands up.  Walters made eye
> contact with Arrugueta, but defied the order to raise his hands.
> Instead, Walters grinned at Arrugueta as the Escort slowly
> began to move forward at a likely speed of around one to two
> miles per hour.  Thus, Arrugueta had, at most, 2.72 seconds to
> react before getting crushed between the two cars.  As
> Arrugueta tried to get out of the way of the moving car, he
> shot Walters through the windshield.

*Robinson,*  415 F.3d at 1253-54 (footnotes omitted).  In concluding that the district court

incorrectly determined that the officer's conduct violated the Fourth Amendment, the Eleventh Circuit noted that the determination of reasonableness must be made from the perspective of the officer, even though the facts had to be viewed in the light most favorable to the plaintiff. *Id.* The Court reasoned that the evidence demonstrated that the officer was standing in a narrow space between two vehicles, the suspect disobeyed the officer's orders to put his hands up, and the vehicle suddenly began to move forward, requiring the officer to make a split-second decision. *Id.* From these facts, the Court determined that the officer believed his life was in danger and the officer's use of force was not excessive "[b]ecause it is constitutionally reasonable for an officer to use deadly force when a suspect is threatening escape and possible harm to others, [and] it is also constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Id.* at 1256.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that an objectively reasonable officer on the scene could have believed that (1) Plaintiff had committed two felonies, burglary and aggravated assault with a deadly weapon, both serious felonies, (2) Plaintiff posed an immediate danger to Defendant Kuzma and other officers at the scene, (3) Plaintiff was attempting to evade arrest; and (4) it was not feasible to provide a warning before shooting at the vehicle. Furthermore, Defendant Kuzma fired only three shots at Plaintiff's vehicle, none of which struck or injured Plaintiff. Thus, similar to *Robinson*, the Court concludes, based on the totality of the circumstances, Defendant Kuzma's use of force was objectively reasonable. Thus, the force was not excessive because it was constitutionally reasonable for Defendant Kuzma to use deadly force given that probable cause existed to believe Plaintiff was trying to escape and

threatened possible harm to others, as well as, Defendant Kuzma.  Accordingly, Defendant Kuzma is entitled to qualified immunity as to this claim.

### ii.   Defendant Ruth

The evidence presented establishes that Defendant Ruth responded to an intrusion alarm call at a business in the early morning hours of May 4, 2008.  Furthermore, before encountering Plaintiff, Defendant Ruth knew that Plaintiff had been observed attempting to remove a rim from a vehicle at the premises.  Thus, prior to shooting at Plaintiff's vehicle, Defendant Ruth had probable cause to believe that Plaintiff had committed a burglary.  As noted *supra*, Plaintiff subsequently entered a plea of no contest to burglary.

Moreover, as Defendant Ruth approached the area in which Plaintiff was last observed, he heard gunshots and believed that Plaintiff had shot at Officer Lincoln, who Defendant Ruth knew was chasing Plaintiff.  Although there is no evidence that Plaintiff fired a weapon on the night of the incident, a reasonable officer at the scene of the offense could have believed that Plaintiff had done so given the circumstances known to Defendant Ruth.  These circumstances include the time the incident occurred, the early morning hours; the officer's reasonable suspicion that Plaintiff had committed the offense of burglary; and the officer's knowledge that Plaintiff was running from Officer Lincoln and was fleeing in a vehicle so as to avoid apprehension.

Defendant Ruth further attests that Plaintiff drove his vehicle toward him and Officer Russell at a high rate of speed, causing him to be in fear for their safety.  However, as noted previously, Plaintiff denies that he saw any officers as he was driving away from the scene.  Defendant Ruth attests that he shot his weapon at Plaintiff's vehicle based on his fear for their safety and to prevent Plaintiff from escaping the area as he feared for the

17

safety of others.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that an objectively reasonable officer on the scene at the time of the events, prior to Defendant Ruth's use of force, could have believed that (1) Plaintiff had committed two felonies, burglary and aggravated assault with a deadly weapon, both serious felonies; (2) Plaintiff posed an immediate danger to Defendant Ruth, Officer Russell, and others based on the gunshots Defendant Ruth had heard, (3) Plaintiff was attempting to evade arrest; and (4) it was not feasible to provide a warning before shooting at the vehicle.  The Court notes that even assuming a question of fact exists as to whether Plaintiff drove his vehicle at Defendant Ruth and Officer Russell, it reasonably could have appeared that Plaintiff posed an immediate danger to Defendant Ruth and others given the time the incident occurred, Plaintiff's flight in his vehicle, and the gunshots that were heard.

Moreover, although Defendant Ruth may have fired as many as eight shots at Plaintiff's vehicle, apparently many, if not all, of the shots did not hit Plaintiff's vehicle in light of Plaintiff's testimony that he does not recall eight shots being fired into the vehicle and "if they were fired, they were fired into the air. . . ."  (Doc. No. 79-5 at 22-23.)  Likewise, Plaintiff was not injured by the shots fired by Defendant Ruth.  Thus, the Court concludes based on the totality of the circumstances, Defendant Ruth's use of force was objectively reasonable.  As such, the force was not excessive because it was constitutionally reasonable for Defendant Ruth to use deadly force given that Plaintiff was trying to escape and threatened possible harm to others, as well as, Defendant Ruth.  Accordingly, Defendant Ruth is entitled to qualified immunity as to this claim.

### iii.   *Defendants Wong and Kirby*

The evidence presented establishes that, like Defendants Kuzma and Ruth, Defendants Wong and Kirby responded to an intrusion alarm call at a business in the early morning hours. Before encountering Plaintiff, Defendants Wong and Kirby had received information from Officer Lincoln, which gave them probable cause to believe that Plaintiff had committed a burglary. Subsequently, Defendants Wong and Kirby followed Plaintiff, who was in his vehicle, with their lights and sirens activated, and Plaintiff failed to stop. Although Plaintiff contends that he was not fleeing to elude them, but instead was simply trying to find witnesses so he could surrender in front of them, the Court concludes that Defendants Kirby and Wong reasonably had probable cause to believe that Plaintiff had committed the offense of fleeing to elude a law enforcement officer. *See* Fla. Stat. § 316.1935 (2008). The Eleventh Circuit has held that "eluding an officer—a felony under Florida law—is a very serious crime. . . ." *Williams v. Sirmons*, 307 F. App'x 354, 361 (11th Cir. 2009).

Moreover, Defendants Wong and Kirby attest that Plaintiff was driving erratically and recklessly, disobeying traffic safety laws and threatening the safety of other drivers on the roadway. As such, they state that they were concerned for the safety of the public because it was unclear what lengths Plaintiff would go to avoid apprehension. In contrast to their attestations, Plaintiff attests that he was driving the speed limit and was traveling no more than thirty miles per hour. (Doc. No. 82-1 at 2.) However, in his deposition, Plaintiff was asked directly if he disputed the officers' estimation that he was driving approximately sixty miles per hour to which Plaintiff responded, he did not know how fast he was driving, but he "had his foot to the floor." (Doc. No. 79-5 at 25.) A federal court "may determine that an affidavit is a sham when it contradicts previous deposition

19

testimony and the party submitting the affidavit does not give any valid explanation for the contradiction." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (citing *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins*, 736 F.2d at 657.  Plaintiff's subsequent attestations that he was doing the speed limit and was traveling no more than thirty miles per hour directly contradict, without explanation, his deposition testimony that he did not know how fast he was driving and that he had his foot to the floor.  Moreover, even disregarding the contradiction between Plaintiff's deposition testimony and his later affidavit, the Court notes that Plaintiff conceded in his deposition that although he did not remember running any red lights, he did not stop for anything.  (Doc. No. 79-5 at 25.)  Plaintiff further admitted that he drove through two residential communities while police were chasing him.  *Id.* at 26.

Defendants Wong and Kirby also attest that during the chase, they thought Plaintiff had fired shots at one, or possibly more, officers when he fled the scene of the burglary. They also believed that Plaintiff had committed the offense of aggravated assault with a deadly weapon.  However, as noted *supra*, Plaintiff maintains that he did not commit the offense of aggravated assault although he entered a plea of no contest to such an offense.

Finally, Defendant Wong attests that after stopping Plaintiff's vehicle in a residential area, he commanded Plaintiff to exit the vehicle with his hands extended but Plaintiff failed to acknowledge the commands and made furtive movements with his hands near his

waistband.  As such, Defendant Wong thought Plaintiff was preparing a firearm for use.

Likewise, Defendant Kirby attests that when Plaintiff exited his vehicle, he commanded

Plaintiff to stop and show his hands several times, but Plaintiff ignored his commands.

Plaintiff admits that he heard someone say stop when he exited his vehicle but he did not

comply and instead tried to jump the fence.  Defendant Kirby further attests that he

observed an object in Plaintiff's hand as he approached the fence.

Viewing the evidence in the light most favorable to Plaintiff, the Court determines

that an objectively reasonable officer on the scene could have thought probable cause

existed to believe that (1) Plaintiff had committed three felonies, burglary, aggravated

assault with a deadly weapon, and fleeing and eluding, all serious felonies, and (2) Plaintiff

was actively resisting arrest.   Additionally, prior to Defendant Wong and Kirby

discharging their firearms, Plaintiff was warned to stop but did not do so.  These factors

weigh in favor of the reasonableness of Defendants Wong and Kirby's use of force.

The closer issue is whether Plaintiff posed an immediate threat to officers or others.

"'Where the officer has probable cause to believe that the suspect poses a threat of serious

physical harm, either to the officer or to others,' use of deadly force does not violate the

Constitution." *Penley*, 605 F.3d at 851 (quoting *Garner*, 471 U.S. at 11, which noted that this

is the case even where an officer uses deadly force merely to prevent the suspect's escape).

The relevant inquiry to make such a determination is "'whether, given the circumstances,

[the suspect] would have appeared to reasonable police officers to have been gravely

dangerous.'" *Penley*, 605 F.3d at 851 (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th

Cir. 2002)).

In the instant case, the Court concludes that given the circumstances, Plaintiff would

have appeared gravely dangerous to a reasonable officer.  As discussed *supra*, a genuine

issue of material fact does not exist, in light of the evidence presented, that probable cause

existed to believe that Plaintiff had committed the offense of aggravated assault with a

deadly weapon by accelerating his vehicle in the direction of Defendant Kuzma when

leaving the burglary scene, and Defendant Wong knew this.  Moreover, Plaintiff entered

a plea of no contest to aggravated assault with a deadly weapon and should not be allowed

to present evidence in the instant civil case to establish that he did not do so.

Plaintiff further demonstrated his propensity to endanger civilians by leading the

police on a chase during which he did not stop, "put [his] foot to the floor", and drove

through two residential communities with the police chasing him.  As the Supreme Court

of the United States explained in the context of whether fleeing an officer in a vehicle

qualifies as a violent felony,

> [w]hen a perpetrator defies a law enforcement command by fleeing in a car, the
> determination to elude capture makes a lack of concern for the safety of property and
> persons of pedestrians and other drivers an inherent part of the offense.  Even if the
> criminal attempting to elude capture drives without going at full speed or going the
> wrong way, he creates the possibility that police will, in a legitimate and lawful
> manner, exceed or almost match his speed or use force to bring him within their
> custody.   A perpetrator's indifference to these collateral consequences has
> violent — even lethal — potential for others.  A criminal who takes flight and creates
> a risk of this dimension takes action similar in degree of danger to that involved in
> arson, which also entails intentional release of a destructive force dangerous to
> others.  This similarity is a beginning point in establishing that vehicle flight
> presents a serious potential risk of physical injury to another.
>
> * * *
>
> Because an accepted way to restrain a driver who poses dangers to
> others is through seizure, officers pursuing fleeing drivers may deem
> themselves duty bound to escalate their response to ensure the felon is
> apprehended.  *Scott v. Harris*, 550 U.S. 372, 385, 127 S. Ct. 1769, 167 L. Ed. 2d
> 686 (2007), rejected the possibility that police could eliminate the danger from
> a vehicle flight by giving up the chase because the perpetrator "might have

been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow."  And once the pursued vehicle is stopped, it is sometimes necessary for officers to approach with guns drawn to effect arrest.  Confrontation with police is the expected result of vehicle flight.  It places property and persons at serious risk of injury.

Risk of violence is inherent to vehicle flight.  Between the confrontations that initiate and terminate the incident, the intervening pursuit creates high risks of crashes. *It presents more certain risk as a categorical matter than burglary.  It is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others.  Flight from a law enforcement officer invites, even demands, pursuit.  As that pursuit continues, the risk of an accident accumulates.  And having chosen to flee, and thereby commit a crime, the perpetrator has all the more reason to seek to avoid capture.*

*Sykes v. United States*,  131 S. Ct. 2267, 2273-74 (2011) (emphasis added).

Thus, Defendants Wong and Kirby reasonably could have believed that Plaintiff, who had chosen to flee in his vehicle, regardless of Plaintiff's reasons for fleeing, would take additional measures to avoid capture, including further endangering the lives of police or residents.  *See, e.g., Terrell*, 668 F.3d at 1254 (noting cases finding no excessive force where "a driver using a vehicle 'in a dangerous and aggressive manner' . . . provided the officers with ample reason to believe that the driver 'posed a threat of serious physical harm or death to the officers, or other passersby, especially in light of the speed with which the incident unfolded.'").

This determination is further warranted when considering that (1) Defendant Wong observed Plaintiff making furtive movements near his waist before he exited his vehicle, (2) Defendant Kirby observed an object in Plaintiff's hand after he exited his vehicle, and (3) Plaintiff refused to comply with commands to stop.  Plaintiff does not dispute Defendant Wong and Kirby's statements but attests that he was unarmed.

"In cases where a defendant mistakenly believed that the suspect had a weapon, a

plaintiff meets his burden of production not where he merely attacks the defendant's credibility, but where he provides affirmative evidence that another witness believed or saw otherwise." *Cooper v. City of Rockford*, No. 06C50124, 2010 WL 3034181, *7 (N.D. Ill. Aug. 3, 2010) (citing *White v. Gerardot*, 509 F.3d 829, 832 (7th Cir. 2007) (finding a genuine issue of material fact concerning whether suspect pointed a gun at the officers where witness testified that she saw him and he did not have a handgun), *Coleman v. Wiencek*, No. 08 C 5275, 2010 WL 1506708, *5 (N.D. Ill. Apr. 13, 2010) (same), and *Nicarry v. Cannaday*, 260 F. App'x 166, 170 (11th Cir. 2007) (fact that it was dark out does not create a genuine issue of material fact as to whether defendant could see a screwdriver in plaintiff's hand where defendant testified that he actually saw it and that plaintiff was actually illuminated by a flashlight, and where there was no witness to say that they did not see the screwdriver)). Plaintiff has presented no evidence that he did not make furtive movements with his hands or that he did not have an object in his hand when he exited his vehicle and was approaching the fence.  A reasonable officer, therefore, could have believed that probable cause existed to believe that Plaintiff was armed when he exited his vehicle and approached the fence.  Although not dispositive, a loaded firearm was subsequently found on the driver's side of Plaintiff's vehicle.  (Doc. No. 82-1 at 3.)

Additionally, the fence that Plaintiff was attempting to climb was in some yards of a residential area, and there were some trees and bushes around the fence.  (Doc. No. 79-5 at 29.)  Despite being shot two times, once in the hip and once in the buttocks, Plaintiff continued to climb over the fence in a residential neighborhood, further evincing the measures he was willing to take to evade capture, again regardless of Plaintiff's subjective intent in trying to elude police.

"A police officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'" *Jean-Baptiste,* 627 F.3d at 822 (holding that officer who fired fourteen shots, eight of which struck the plaintiff who had a firearm, "reasonably responded with deadly force, and . . . was not required to interrupt a volley of bullets until he knew that [the plaintiff] had been disarmed") (quoting *Crenshaw,* 556 F.3d at 1293) Thus, although Defendant Wong and Kirby continued to fire shots after Plaintiff was over the fence, there is no indication that they were aware that Plaintiff was attempting to surrender.  In fact, Plaintiff admitted that after he was shot as he was climbing the fence, all he heard was more gunfire until he heard an officer asking from the other side of the fence where he was.  (Doc. No. 79-5 at 29.)

Finally, to the extent Defendants Wong or Kirby made statements after apprehending Plaintiff indicating that they would have killed him if given only a few more seconds, the Court notes that "'[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.'" *Jean-Baptiste*, 627 F.3d at 821 (quoting *Graham*, 490 U.S. at 397).  Thus, in light of the totality of the circumstances, the Court concludes that a reasonable officer in Defendants Wong and Kirby's shoes would have had probable cause to believe that Plaintiff presented a grave danger to the officers and residents of the community into which Plaintiff was attempting to flee.  Accordingly, the Court concludes that Defendants Wong and Kirby did not use excessive force in violation of the Fourth Amendment, and they are entitled to qualified immunity as to this claim.

**B.    *Dog Bite***

Plaintiff states in his amended complaint that after he was apprehended by Defendants, he was placed on the ground while Defendants surrounded him and another officer's K-9 chewed off his calf requiring him to be hospitalized for a month. (Doc. No. 45 at 10.) Defendants failed to address this claim in their motion for summary judgment except to state that "[n]o force was used after the handcuffs were applied to Peterson." (Doc. No. 79 at 5.) Defendants note that "Peterson made reference to a dog bite which he learned of from hospital personnel however, no one on the scene of the apprehension, Peterson included, remembers K-9 being deployed." *Id.*

The Court directed the parties to supplement the record as to this claim. *See* Doc. No. 90. In response to the Court's Order, Defendants maintain that Plaintiff has not presented admissible evidence that he was bitten by a dog so as to demonstrate a genuine issue of material fact exists. (Doc. No. 92 at 2-5.) Defendants concede, however, that qualified immunity is not appropriate if the Court determines that a genuine issue of material fact exists as to whether Plaintiff was bitten by a dog. *Id.* at 5.

"It is clearly established in this Circuit 'that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" *Bailey v. City of Miami Beach,* No. 11-13908, 2012 WL 1414941, at *2 (11th Cir. Apr. 25, 2012) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341–42 (11th Cir. 2007) (quotation marks omitted)). "'But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so.'" *Id.* (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008)).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes

that Defendants have not demonstrated that they are entitled to qualified immunity as to Plaintiff's excessive force/failure to intervene claim.  The evidence presented demonstrates that Defendant Kuzma, who arrived after the vehicle chase had terminated, handcuffed Plaintiff, after which Plaintiff remained lying on the ground.  (Doc. No. 79-1 at 2; Doc. No. 82-1 at 4.)  According to Plaintiff, Defendants surrounded him as he lay on the ground, face-down in handcuffs.  (Doc. No. 82-1 at 4.)  Subsequently, Plaintiff said he heard the officers yell to look out for the dog.  (Doc. No. 79-5 at 33-35; Doc. No. 82-1 at 4.)

Plaintiff testified at his deposition that he did not remember the dog biting him at the time of the incident; however, he subsequently attested that the dog bit him while he was handcuffed and lying on the ground.  (Doc. No. 79-5 at 34; Doc. No. 82-1 at 4.)  Plaintiff further attested that he did not remember the dog biting him at that time of the incident because he was in shock and pain from his gunshot wounds.  (Doc. No. 82-1 at 4.)  Plaintiff testified at his deposition that the paramedic who treated him after the incident told him that he had to "take care of the dog wound ASAP" because "the dog bit off half [his] calf." (Doc. No. 79-5 at 35.)  Plaintiff also attested that he received medical treatment for a dog bite on the date of the incident.  (Doc. No. 82-1 at 4.)  Plaintiff further submitted medical documents from May 4, 2008, that reference a dog bite.  *Id.* at 17-19, 21-22.  The medical documents list the patient's name as Oelweinmay Doe.  *Id.*  However, Plaintiff also submitted a document dated May 11, 2008, from the Orlando Regional Healthcare System entitled, "Coding Summary", which identifies Plaintiff as the patient, notes an admission date of May 4, 2008, and references a diagnosis for a dog bite.  *Id.* at 20.  Defendants attested that an OPD K-9 was not deployed after the vehicular pursuit concluded, no force

27

was used against Plaintiff after he was handcuffed, and Plaintiff was not bitten by an OPD K-9.  (Doc. No. 79-1 at 2; Doc. No. 79-2 at 2; Doc. No. 79-3 at 3; 79-4 at 3.)

"The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'"  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  "[A] district court[, however,] may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'"  *Id*. at 1323.  Statements are reduced to admissible form when "the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent). . . [is] admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence)."  *Id*. at 1323-24 (footnotes omitted).

Rule 803(1) provides that, "regardless of whether the declarant is available as a witness[,]. . . [a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the hearsay rule. Fed. R. Evid. 803(1).  "The underlying theory of this exception is that the 'substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation.'" *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (quoting *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir. 1981)).  The paramedic's statement to Plaintiff described the condition of Plaintiff's calf and was made either while

or immediately after treating Plaintiff's leg shortly after his apprehension. Thus, it appears that this statement could be reduced to admissible form at trial pursuant to Rule 803(1).

Plaintiff's attestation that after he was handcuffed, "the police dog bit [him] causing even greater pain", contradicts his prior deposition testimony that he did not remember the dog biting him. The Eleventh Circuit has explained:

> "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). In *Lane v. Celotex Corp.*, 782 F.2d 1526 (11th Cir. 1986), we clarified that "we may only disregard an affidavit that 'contradicts, without explanation, previously given clear testimony.'" *Id.* at 1532 (quoting *Van T. Junkins*, 736 F.2d at 657); *see also Tippens v. Celotex Corp.*, 805 F.2d 949, 955 (11th Cir. 1986) (Hill, J., specially concurring) ("The *Lane* decision drastically limits this court's holding in [ *Van T. Junkins* ]."). We have explained that the *Van T. Junkins* "rule is applied 'sparingly because of the harsh effect it may have on a party's case.'" *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)).

*Santhuff v. Seitz*, 385 F. App'x 939, 944 (11th Cir. 2010).

Plaintiff seemingly attempts to explain his contradictory statement in his affidavit as follows, "Having started to enter a state of shock from the pain and the severity of my wounds, I was not at first aware of the K-9 dog biting me. I became aware of the severity of the bite when examined by the paramedics who treated me and while examined by the physicians." (Doc. No. 82-1 at 4.)      Given that Plaintiff appears to recede from his unequivocal attestation that a dog bit him by clarifying that he was not initially aware that a dog bit him because of the pain, the Court cannot conclude that his deposition testimony and affidavit are inherently inconsistent. *See id.* at 944-45 (quoting *Rollins v. TechSouth, Inc.*,

833 F.2d 1525, 1530 (11th Cir. 1987), for the proposition that "'[o]ur cases require a court to find some inherent inconsistency between an affidavit and a deposition before disregarding an affidavit' and state that if no such inherent inconsistency exists, 'any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.'"). Therefore, Plaintiff's attestations in his affidavit may be considered in the determination of whether a question of fact exists as to whether Plaintiff was bitten by a dog. Considering Plaintiff's testimony concerning the paramedic's statements and the officers' statements to look out for the dog along with Plaintiff's attestations in his affidavit, the Court concludes that a genuine issue of material fact exists as to whether Plaintiff was bitten by a dog after he was handcuffed and lying on the ground.[9]

In *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919, 923 (11th Cir. 2000), a case factually analogous to the instant case, two officers chased a burglary suspect until the suspect surrendered, lying down on the ground. Despite the fact that the suspect had fully complied with the officers' commands, one of the officers ordered his police dog to attack the suspect, while the second officer watched the incident from close proximity and did nothing to stop the attack. *Id.* at 923–24. The Eleventh Circuit concluded that the second

---

[9]Plaintiff submitted what he attests are his medical records, which indicate he was treated for a dog bite on the date of the incident. (Doc. No. 82-1 at 6, 17-22.) Thus, it appears Plaintiff is seeking to submit these documents pursuant to the business records exception to the hearsay rule. "A business record is admissible if it was 'kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the' record." *McCaskill v. Ray*, 279 F. App'x 913, 914 (11th Cir. 2008) (quoting Fed. R. Evid. 803(6)). To be admissible, however, "the business record must be supported by testimony of a 'custodian or other qualified witness, or by certification that complies with [Fed. R. Evid.] 902(11).'" *Id.* (quoting Fed. R. Evid. 803(6)). Plaintiff did not include an affidavit of a custodian or other qualified witness or certification in compliance with Federal Rule of Evidence 902(11) in relation to these documents. Thus, the Court will not consider the documents for purposes of the present motion. *See, e.g., id.* (concluding that the district court erred in considering business records on motion for summary judgment in the absence of a certification in compliance with Rule 902(11)).

officer was not entitled to qualified immunity because "the dog's attack on Plaintiff may have lasted as long as *two minutes* . . . [,which] was long enough for a reasonable jury to conclude that [the officer] had time to intervene and to order [the first officer] to restrain the dog." *Id*. at 925 (emphasis in original).  The Court determined that sufficient evidence existed that the second officer violated the plaintiff's clearly established rights by watching "the entire event" while "in voice contact" with the first officer and taking no action to stop the dog attack.  *Id.*  The Court further held that the law was clearly established at that time that "a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene. . . ."  *Id*. at 927.

In the instant case, Defendants have not offered any evidence demonstrating that they attempted to intervene or were unable to intervene in the purported K-9 biting Plaintiff's calf after he was non-resistant.  Likewise, Defendants have not offered any evidence showing that the alleged K-9's attack of Plaintiff was so brief that they could not have intervened and directed the K-9 to be restrained.  Instead, Defendants simply attest that no OPD K-9 bit Plaintiff and no force was used after he was handcuffed.[10]  In light of the evidence presented, the Court finds that a genuine issue of material facts exists as to whether Defendants used excessive force by allowing a K-9 to bite Plaintiff or failed to intervene when a K-9 bit Plaintiff.  *See, e.g., Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012) (concluding that issue of fact existed, such that qualified immunity was not warranted, where officer used dog to attack compliant suspect for five to seven minutes

---

[10]The Court notes that Defendants do not attest that Plaintiff was not bitten by a K-9 on May 4, 2008, but instead attest that Plaintiff "was never bitten by any *OPD K-9* on May 4, 2008." (Doc. Nos. 79-1 at 2, 79-2 at 2, 79-3 at 3, 79-4 at 3) (emphasis added).

and where another officer failed to intervene in violation of the plaintiff's Fourth Amendment right).  Accordingly, Defendants' motion for summary judgment as to this claim is denied.

Accordingly, it is hereby **ORDERED and ADJUDGED** as follows:

1.      Defendants Kuzma, Ruth, Wong, and Kirby's Motion for Summary Judgment (Doc. No. 79) is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** as to Plaintiff's excessive force claim against all Defendants based on the discharge of firearms. The motion is **DENIED** as to Plaintiff's excessive force/failure to intervene claim arising from an alleged dog bite.

2.      The Clerk of Court is directed to terminate Plaintiff's Amended Motion for Summary Judgment (Doc. No. 82).

3.      The Court hereby revives Plaintiff's Motion for Appointment of Counsel. (Doc. No. 12.)  The Court will attempt to find counsel to represent Plaintiff at trial.  An order will be entered thereafter setting a trial schedule.

**DONE AND ORDERED** in Orlando, Florida, this 20th day of August, 2012.

_David A. Baker_

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies to:
OrlP-1 8/20
Tyrone Jerome Peterson
Counsel of Record